We'll hear argument this morning in Case 16-1435, Minnesota Voters Alliance v. Mansky. Mr. Bremer. Mr. Chief Justice, and may it please the Court, Minnesota's statute bans all conventional political expression on apparel to prevent a smaller class of material that can already be regulated under other election statutes. Shirts saying AFL-CIO, Chamber of Commerce, MoveOn.org, excuse me, and countless other examples are prohibited. Since a vast amount of the banned material is legitimate speech, and the statute has a few plainly justified applications, it is overbroad and unconstitutional. Which are those? I was just going to ask you, those examples you gave, in your view, could be prohibited by a properly drawn statute? MoveOn.org and so forth, you say could be prohibited under a properly drawn statute? They can't. They are prohibited. They are prohibited. Could they be prohibited under a statute that was more narrowly drawn? No, I do not think they could. Under any test, that type of generalized political expression, associations, NAACP, countless others, could not be. Could you clarify the procedural posture of this case? I gather the first time around, it went to the Eighth Circuit and they rejected the facial challenge, but they sent it back on as-applied. District Court said as-applied is also dismissed, and it went back to the Eighth Circuit. So what are we dealing with, a facial challenge, or are we dealing with an as-applied challenge? It's solely a facial challenge, Your Honor. The as-applied claims were not appealed, and they're not before the Court. So the only question is whether this statute on its face violates the First Amendment overbreadth doctrine, and it does violate the First Amendment doctrine, First Amendment overbreadth doctrine, because it sweeps in so much political expression and association. Do you think, Mr. Bremer, that a statute could target only electoral speech? In other words, Clinton for President, Trump for President, that sort of thing. And could a statute say that that speech cannot be worn in the polling place? Yes, a statute does say that. In Minnesota, the first sentence of this statute. No, I know, but could a statute constitutionally say that? If it were limited to that, would that be permissible, or is it impermissible? Yes, Your Honor. It's a very close call, but it's not one that this Court has to make in this particular case. I know, but I'm just asking your view. I honestly don't know, Your Honor, whether that line is so close, but the statute here, the first sentence already prohibits that material, and it's unchallenged, that particular sentence here. And even assuming you could ban advocacy expression, this statute goes so far to take in so much material that isn't advocacy, that is simply self-expression of personal values and associations. So I agree it's a very tough call, but it's not one this Court has to decide. But it's important for us. We're going to have to write an opinion on this. You say, well, I don't know. What about political buttons? Vote for X or vote for Y, and they're both on the ballot? Correct. As I mentioned before, the statute, the first sentence already bans that. We're asking about a hypothetical case. Could a statute that was limited to that be upheld? And would it be constitutional in your view? No, I don't think it would be. I don't think it would be. All right. Because of the passive and non-disruptive nature of the speech, people simply wearing that type of clothing as they go in and out of the polling place. So you're telling us to overrule Burson? No, Your Honor, I'm not saying that at all. Burson basically said the opposite of what you're saying, directly and completely. Well, as we read Burson, it didn't deal with the passive wearing of any kind of apparel campaign or more general political apparel. It dealt with active campaigning and material used in conjunction with that conduct. That's the line you're drawing, because someone puts something on instead of handing it around? That's the line you want us to draw? Well, that's part of the line. It's not the passive nature of the material undercuts the State's interest in claiming that it's disruptive. Mr. Bremer, passive versus active sounds a lot like the act-omission distinction, and that has proven to be one of the most slippery concepts in all of law. Is it an act to put on a button, or is it an omission to not speak about what's on the button? A T-shirt you say is passive. What if it were instead a sign on my head, you know, flashing lights? Is that active or is that passive? How are we supposed to police the line you're suggesting? Well, what I'm suggesting, Your Honor, is that the line is already policed. All the government's interest that it's claiming in polling places are already regulated by other statutes. For instance, Minnesota's anti-intimidation statute, Section 211B.07, could be utilized to get at intimidating and threatening messages in the polling place. Similarly, it has a — They talk about other interests like decorum and dignity, and those aren't addressed by the other statutes. No, they're not. Well, they are addressed by Section 204C.06, Your Honor, which prohibits disorderly conduct and interference. Well, there's a difference between interference with someone's right to vote or disorderly conduct and decorum. They're not the same. Decorum obviously reaches further than you can't intimidate someone. Yes, it probably would, Your Honor. That's true. But there's no right to vote, as far as I understand it. There's a right to vote free of intimidation, but there's not a right to vote free of being bothered at all. Polling places are not pristine retreats from the real world, and I don't believe the government can sacrifice the First Amendment to make them that way. Well, you say that, but I wonder if the State can make an opposite determination and say, you know, for however many months we've had this maybe bitter, sharp political campaign going on, and maybe just before you cast your vote, you should be able to have a time for some quiet reflection or to do that important civic obligation in peace and quiet without being bombarded by another campaign display. And, you know, you say it's passive but not active, but, you know, a picture can be worth a thousand words. And people's apparel can convey very strong and shocking images that maybe the State can decide that just before you cast your vote, you should have at least a moment free of all the storm and drong of the campaign. That's true. And there are legitimate interests in the polling place. The problem here is that most of the material that it wants to get, if not all of it, is already covered. And the small amount that you're suggesting is not covered. Ginsburg. You've answered that it's already covered, but it's no good. You've said it's no good. Excuse me? I'm sorry. You said the coverage was no good, but you could not cover. If I'm — yes, Your Honor. If I'm pressured to make the call on whether you could constitutionally prescribe campaign apparel, specifically advocacy apparel, I would say no. But the statute here goes far beyond that. You're pressured to come up with a workable rule to guide us when we write this decision. Yes, Your Honor. And you're telling, in response to the Chief Justice, basically, that the State's interest in decorum and solemnity and the dignity of the voting process cannot be protected by rules relating to buttons and apparel. I'm saying, Your Honor, that it's not reasonably protected in this instance because it sweeps in so much material that's not reasonably related to those interests. Well, suppose we think that it would be a different case and that a State could have a law that prohibits the wearing of buttons or any other — or attire that contains the name of a candidate or refers to a ballot issue or the name of a political party that has candidates running for office in that election. If we thought that that would be consistent with the First Amendment, would that doom your case or would you still have additional arguments? No. That, Your Honor, that is one place where you can draw the line. And if the line is drawn there, this statute still fails. It's still overbroad because it sweeps in so much other, all clinical experience. And what would be the justification for that line, in your view? Well, the justification — In other words, why would we put one — all the materials that Justice Alito talked about on one side of the line and all the materials that you think a State cannot restrict on the other side of the line, in your view? What's the difference? I think that you could arguably conclude that that type of apparel is reasonably related to the government's legitimate interest in preventing undue influence in polling places. But shirts that simply say AFL-CIO, Chamber of Commerce, NAACP, those are not related to the government's interest. How about issues on the ballot? Yes, Your Honor. I would — All right. So let's talk about a fiscal matter. Could someone then wear a button or a shirt or could the State ban a button or a shirt that said restrain government spending? No, Your Honor. I don't believe it could because the connection is — I think your adversary says they can because it's a political issue display. That's correct. I think they do today. And that's where you say they can't. No, we say — Even though that's on the ballot. A fiscal issue? I think the connection would be too attenuated because then you could extrapolate it forever. Do you — but do you think a reasonable observer would think it's too attenuated? I think — yes, I do think a reasonable observer would not see generalized political apparel as an influencing towards something on the ballot, and that's the problem with this statute. It seeks to silence so much peaceful conventional messaging by the blunt means of outlawing everything. Could they have a statute that covered one thing that is in this case, is not hypothetical, and it doesn't have to do with the issue on the ballot, but the please ID me, please ID me button, which was challenged, and then you chose not to pursue that. But what is your position on that? Could a legitimately tailored statute stop you from having the please ID me button? Yes, it could. And I think that Minnesota's anti-deception, anti-fraud statute that's already on the books could be used — could have been used and could be in the future if similar circumstances come up, could be used to deal with that button. That's section 201B.07 again. That's the anti-intimidation statute. There's also a fraud statute, which is 204C.035. All of the government's interests can be already addressed through its election statutes, and that's what makes this statute so overbroad, is that it's trying — they're trying to get at a small slice of potentially uncovered material by banning all political expression and association, even items that don't go to ballot issues, that don't go to candidates, that are just personal expression of political beliefs and political values. It just is a little bit hard, Mr. Bremer, to evaluate an argument of overbreadth unless we have a clear view from you as to how far you think a State could go. So I'm not sure that you've given us that view. I mean, are you — do you want to accept Justice Alito's suggestion, or do you want to draw the line at some other place so that we know, okay, that's permissible, this is impermissible, how does this relate to that? That's the usual way overbreadth analysis goes. Yes, Your Honor. And it's very difficult, given the range of available material that's out there and the number of interests the government has here, to be able to put every item in the appropriate box. I think it's very hard to draw a line, other than drawing a line through this particular sentence, which would allow the government to continue to pursue its interests but accommodate free speech. I agree. Well, if the Court is concerned about preserving the dignity and the decorum and the solemnity of the voting process, and the statute is as difficult as you say, isn't that an argument for allowing good-faith determination on a case-by-case basis by the polling officials? No, I wouldn't say that, Your Honor, because in the meantime, free speech would be chilled. All this conventional political expression and association that no reasonable person would see as a threat to the polling place would be chilled in the process as it's being chilled right now and will continue to be chilled unless the statute is invalidated. So I agree that it's a possible line to draw at advocacy material, but in any event, the statute would fail because it still sweeps in the rest of the conventional expression. If that were where we drew the line, I mean, what would be encompassed in advocacy material? Would it be only things that named a candidate's name? Your Honor, I think it would be anything that said for or against a candidate or an issue directly on the ballot. How about if it said resist? I think that would be constitutionally permitted and should be, and generalized slogans. Make America great again. That type of slogan, too. I think that should be constitutionally permissible. Colors, generalized colors. Otherwise, you start to bleed over and pretty soon you have the problem that we have here of discretionary enforcement, and you're swallowing all this other legitimate speech when you're trying to just stop that type of advocacy material. Why should there be speech inside the election booth at all? Or inside the, what do you call it, the election room? Let's say that it's a small room. Why should there be any speech there at all? You're there to vote. Your Honor, because the First Amendment doesn't stop at the polling place door, even if it's a non- That's one of the questions in the case. What's your citation for that? Jews for Jesus, Your Honor. Was it an airport? It was an airport. It was a non-public forum, Your Honor. That's why I'm referring to it. Justice Kennedy asked the question, could a State say that the polling place is off limits to any kind of advocacy or promotion of any point of view? A State could say that, yes, Your Honor, and Minnesota has said that. I'm sorry if I misunderstood. I thought your question was whether you could create an entirely First Amendment free zone in the polling place, and my answer to that would be no, you can't. And this gets close to a First Amendment free zone because political speech is such a core part of the First Amendment that it's a political speech free zone, and while you may be able to, the government may be able to ban a certain small class of material, for instance, the advocacy material, it couldn't sweep in all the rest of the available political speeches out there, Resist, Sure It's Me Too, and so on. But that's exactly what it's doing here. It's trying to silence all this legitimate speech by, to go after a small slice that it can already regulate under its other statutes. Ginsburg. So what do you put in what the State can do in addition to vote for Candidate X or vote against Proposition Y? As a bright line, Ruler, Your Honor, I don't see any other feasible bright line. I think that the State would have to, if there's an intimidating message that comes in, I think the State would have to deal with that on an as-applied basis as events occur under its existing statutes. You took the position that Me Too, Please ID Me wasn't intimidating. No, Your Honor. Or that it was free speech that should not be stifled, correct? Are you changing your mind on that now? No. Our position was that as pure speech, just the words on that button were, yes, it was protected speech. That's correct. So there's always line drawing. Whether you call it intimidating speech or not, someone's going to have to draw a line. So going back to Justice Kennedy's point, why, if this is not a public forum, why can't the State reasonably draw the line at saying political speech of any kind can be potentially intimidating in a voting place, and we won't permit it? I think the reason is that the First Amendment continues, as I mentioned before, continues to apply in polling places. And once we start to create these persons. It does. You can vote. That's the permitted political activity. Correct, Your Honor. So it's not all as being – I suspect that on a military base, we would say it would be okay for the Army to say, on military grounds, we're not going to permit political speech. Well, I'm not quite sure about that, Your Honor, because in Greer – in the Greer decision, the Court said that conventional political speech would not be banned. This Court has never upheld a prohibition on political speech as broad as this. Have we ever said that it would be permissible to ban all political speech on military grounds? No, Your Honor. In Greer, the Court said that conventional political speech was – continued to be permitted. And so I guess the answer to the question is that this Court has never upheld a prohibition this broad. And even in nonpublic forums, even on a military reservation, in an airport, in a school, in Cohen, Tinker, in Greer, in all these cases, the Court wasn't willing to draw a line. Because there was not a State interest that would permit it. Well, that's correct, Your Honor. There wasn't a State interest. But here there is a State interest that was recognized in person as being quite important and very legitimate. It's true. There are important interests, and we don't deny that. The problem is that the means being used, it's such a blunt means that it's swallowing a lot of political expression that doesn't have a reasonable connection to those particular interests, like simply wearing a shirt that identifies an organization that has political views or a hat or any other sort of apparel that simply identifies the wearer's personal beliefs. A lot of this material is not worn as advocacy or to influence, but simply as self- expression on the day of election when people want to express their own political views when everyone is talking about them and wear them in. So that type of material, I don't believe our position is it cannot be banned, even under the most lenient test, because it's not related to these interests. Now, there is some material, threatening, intimidating material, threats to particular classes, that could be under Minnesota's anti-intimidation statute. But the problem we have here is that this statute doesn't stop there. What about the concern about coordination? Whatever the group is, the big employer, the union, teachers, whatever. We're all going to show up and we're all going to have these buttons on or whatever, and maybe you're a member of the group and you don't agree with the position and you'll feel some pressure to transform your speech from what you really would like to say, or you wouldn't like to say anything about it, and yet you're going to be identified because you don't have our button. You're not doing what you should be doing to support the group. Yes, Your Honor. And if that situation did come up, it could be addressed under section 204C.06, which prohibits the voter interference and disorderly conduct and loitering in the polling place. Well, but nobody would say that it's interference or disorderly conduct. It's subtle psychological pressure. I don't think that would be covered by any of those other statutory provisions. And in that case, Your Honor, then it would be, could be dealt with on an as-applied basis as the circumstances come up if it crosses the line between speech and conduct. As-applied under what? Under what? You have to have a statute to apply. Yes. And I'm still referring to the other statutes. It could be addressed as an as-applied challenge under those situations, under those existing statutes, because it's crossing the line. In that kind of situation, it would cross the line between speech and conduct. And once you cross the line between speech and conduct, or speech and electioneering, if you draw the line at advocacy, it would cross the line between electioneering, either one of those, and then you could deal with it on that situation. I would mention, though, it is a fact that that type of behavior is already not allowed in polling places because of the other interests and statutes in there that try to keep it in a quiet decorum and limiting people for only the purpose of going in and out. How many other States have laws that go as far as Minnesota's? Your Honor, we believe nine is our estimate. And the remainder deal with electioneering. They stop at electioneering at the advocacy material that we were discussing before. So there's nine States that have similar this. And what has been the experience of these other cases, these other States? Have they had brawls in the polling place? They had disturbances in the polling place? No, Your Honor. There's no evidence of disruption either in Minnesota or these other States caused by simply wearing. Are there States that don't have laws that go as far as Minnesota's? What has been the record there? As far as I know, Your Honor, it's not in this record. As far as I know, there hasn't been any instances of a disruption caused by people wearing apparel except for when polling workers confront people wearing apparel and then stop the process to try and police their clothes. And that's part of the problem here is that disruption and intimidation is often going to occur through the policing of someone's shirt, not through the fact that they're passively wearing it as they go in and out of the polling place. And does the record show how many officials would be making these determinations at a general election in Minnesota and how they're selected? The polling officials, Your Honor? Yeah, the polling officials. They're selected from the parties, various parties, names. A list is submitted and they're selected. I don't know how many there are. We know that there's more than one. We also know that there's other officials sometimes that go in there. So they're selected by the parties. So if an official from one party thinks that the attire of a particular voter violates this law, what happens? That's the final decision? What happens at that point, Your Honor, is yes, that's a final decision in this respect. The voter with the apparel must either take off their clothes or have their name and address. But if the other election judge says, I disagree, then what happens? Then I think they would call the head judge, Your Honor, and there would be a decision head election judge and there would be a decision being made. And in the meantime, there would be a disruption going on in the polling place because apparel is being policed. And again. I'm sorry. Who selects the head election judge at any particular place? I'm sorry, Your Honor. I don't know the answer to that question. My co-counsel. Well, I'll ask, I guess I'll ask the State. Do you know whether these people have any training? Are they all chosen to be the reasonable observer? Do they, you know, test them to see if they're the reasonable observer? Do we know? I don't know. I know that they try to train them, Your Honor. And this is how the Election Day policy in this case came up. The election officials attempted to train the officials to, polling officials to apply this very broadly to material that names an organization, advocacy material, party material, and not limited to that. So there is some effort to train them. But the effort in this case confirmed that this statute sweeps so broadly that there's almost virtually nothing political that it can't take in. I'll reserve my remaining time. Thank you, Counsel. Mr. Rogin. Mr. Chief Justice, and may it please the Court. Minnesota's restriction on speech in the polling place does not violate the First Amendment. It is a reasonable and viewpoint-neutral speech restriction in a quintessential non-public forum that protects the fundamental right to vote. This Court has recognized that ensuring the integrity of our electoral process and protecting the fundamental right to vote are government interests of the highest order and that laws advancing these important interests may constitutionally limit speech. Minnesota's prohibition on political apparel in the polling place is such a law. This law protects the integrity of the elections by preserving order and decorum in the polling place and preventing voter confusion and intimidation. It does reach quite a bit beyond what I think a reasonable observer would think is necessary. Do you really think if someone has a shirt with the tiniest little logo or inscription here that that's going to have any effect on decorum? Your Honor, the test that Minnesota has is what a reasonable observer would understand is advocating electoral choices. So in some ways, a tiny lapel pin that no one can see is not going to be. You can see it. I mean, you can see it and you know it's the logo of one of the campaigns. Certainly. Yes, Your Honor, I do think that that causes the problems and is constitutionally prescribable. And it's for the reasons that you discussed, which is the intimidation that can occur is not just based on the plain meaning of what the apparel says, that it's somehow intimidating on its own. It's a prophylactic measure designed to prevent the type of intimidation that you talked about, which is that having people identify with particular candidates allows them to then suddenly feel like they either have to comply or that they are going to be singled out. And that can lead to the intimidation. And that's what the history of in Minnesota and in states in the late 1800s that led this court in Burson to uphold exactly that type of prohibition. Well, I don't know if I discussed the issues. I asked questions. But I just don't understand where the disruption of the decorum comes with respect to anything that qualifies as political. I mean, people going to vote certainly would expect that they would see people arguing for their candidates or the other candidates. Now, maybe not within 100 feet or whatever. But the idea that they are going to be protected from recognizing that other people support different candidates than they might, I think, is a bit more of a stretch. Certainly, Your Honor. And I think Burson recognized that order and decorum can be called into question by simply wearing campaign material. All that Minnesota's law does is extend that line to political material. And it's for the exact same reasons. It's that when you have a campaign that's gone on for months and we end up at the election day in the polling place where we've asked people to come forward to exercise their right to vote, that is a place where we want to ensure that there's order and decorum so that there is the solemnity that goes with voting. And having people identify themselves with a pin that is a campaign or a political message on it reasonably could lead to disruption. And that disruption — How would — well, how far does this go? The clear case is appendices vote for candidate X. But we're told by the Petitioner that you can't wear a pin saying, me too. You can't wear a pin saying, ACLU defends free speech. Your Honor, the line that we have drawn is campaign material plus political material, with the definition of political material being reasonably related. A reasonable person would understand that the message that's being delivered is one regarding electoral choices in the polling place. And so — Where does that limitation come in, electoral choices in the polling place? Your Honor, it comes from the definition of political, which is in Election Day Electioneering Statute, and from the definition of political purpose, which is in the statute, which describes — that uses the word political to mean influencing voting in an election. But the problem is that so many things have political connotations, and the connotations are in the eye of the beholder. And on Election Day, you're going to have hundreds, maybe thousands of officials in Minnesota, and every one of them probably thinks that he or she is the reasonable observer, and they're making a determination about whether something has political connotations. And in one of your elections in 2016, I think you had — the president was running, members of the House were running, members of the state legislature were running, state judges were running, there were local elections, there was one ballot question. So the observer would have to know all of the issues in all of those campaigns and would have to decide whether something had connotations regarding any of those issues. It's an invitation for arbitrary and — arbitrary enforcement and enforcement that's not even-handed. And I have no idea where the line lies. Some of the examples that were raised in the Eighth Circuit were really pretty — and the State said, yes, that would be prohibited. An AFL-CIO shirt, that would be prohibited? So, Your Honor, the — I think the answer is, is that it has two components to it. It has to be understood as relating to electoral choices, and it has to be well-known. So many of the examples that you talked about simply wouldn't be well-known. It's a reasonable observer sitting in the polling place on Election Day after there's been a campaign, after there's been the issues that have been raised that are relevant to the election, deciding whether or not they believe that it's reasonable to understand the message being — Yeah, well, that makes it worse, that it has to be well — it's not only does it have to be a political message, but it has to be well-known. What is well-known? Well, Your Honor, the political has a plain meaning in our statute based on that it's influencing elections. All that I'm describing is that something that is political, for example, that is known to only a few people but is clearly political, is not going to be something that's going to be reasonably understood by voters in the polling place. How about a shirt with a rainbow flag? Would that be permitted? A shirt with a rainbow flag? No. Yes, it would be permitted unless there was an issue on the palette that related somehow to gay rights. How about a shirt that says Parkland Strong? No. That would be allowed. I think, Your Honor — Even though gun control would very likely be an issue? To the extent — I bet some candidate would raise an issue about gun control. Your Honor, the line that we're drawing is one that is related to electoral — What's the answer to this question? You're a polling official. You're the reasonable person. Would that be allowed or would it not be allowed? The Parkland? Yeah. I think today that would be — if that was in Minnesota and it was Parkland Strong, I would say that that would be allowed in, that there's not — How about an NRA shirt? An NRA shirt today in Minnesota? No, it would not, Your Honor. I think that that's a clear indication. And I think what you're getting at, Your Honor — How about a shirt with the text of the Second Amendment? Your Honor, I think that that could be viewed as political, that that would be — How about the First Amendment? No, Your Honor. I don't think the First Amendment. And, Your Honor, I — No what? It would be covered or wouldn't be allowed? It would be allowed. It would be. It would be. And I think — I understand the idea and I've — there are obviously a lot of examples that have been — Yeah, well, this is the problem. How about a Colin Kaepernick jersey? No, Your Honor. I don't think that that would be under our statute. And I think — How about All Lives Matter? That could be, Your Honor. That could be perceived as political. And I think, obviously, Your Honor, there are some hard calls, and there are always going to be hard calls. And that doesn't mean that the line that we've drawn is unconstitutional or even unreasonable. How about an I Miss Bill shirt? I'm sorry, Your Honor, I didn't — An I Miss Bill. Or, to make it bipartisan, a Reagan-Bush 84 shirt. Yes, Your Honor. I believe that that's political. I can do this, too, I guess, with — can't you? With the need in State-run hospitals to restrict conversation in certain areas to medical matters, the need in law schools or other schools to restrict conversation in the class to the subject that is being taught, including politics, the need in — I don't know. You make it up. But I — because that's what we're doing. It's what I'm doing. And I can think of many, many instances where thousands, perhaps millions of people have to have the authority to operate a standard, to restrict the speech to the subject that's at hand. And so if, in fact, we are trying to have a place where a person has reflective thought for a moment after the hurly-burly of the campaign, this problem will inevitably arise. One way of correcting mistakes is through as-applied challenges after the event. So my question is, how does that work? How does an as-applied challenge work, Your Honor? Suppose, in the examples that you've heard, there were mistakes made. The person who's running it thought that the Rainbow Coalition was an issue in the case, because one party wanted to have it, and the other party was against it. Suppose he made a mistake and kept out the person with the sign or the T-shirt, either of which could have a rainbow on it. Suppose he's mistaken. Is there any remedy in your state? What occurs if there is speech that is proscribable is the election judge will ask the person to cover it up. And the remedy for that, then, is if the person can either cover it up and proceed to vote, and that ends it, or if they proceed to vote, their name will be identified in an election day log indicating that they were wearing political material. And that, in all cases so far, has ended the inquiry. There hasn't been any adverse actions. Ultimately, if somebody was — a case was brought in the administrative hearing process, the penalty is up to a $300 fine, which is a traffic ticket. But I guess the issue is how do you know if a mistake has been made? You know, if someone makes a judgment and it's challenged, how do you know a mistake has been made? I mean, the question — the concern, of course, is what the case could be largely about, is whether or not there are standards that can be applied in a reasonable way. And it's not a question, really, of review in an as-applied or other challenge to see if there's been a mistake, unless the courts are going to be in the position of deciding all of those questions. Your Honor, I think the history of Minnesota statute shows that we have a workable definition. For over 100 years, we've had this statute in place, and we haven't — this is the first time that it's been challenged by anybody objecting to an argument that they believe that their speech was not political. And the speech here is clearly within the heartland of the statute. The police ID — Do you know how often, Mr. Rogin, people are asked to cover things up? I mean, do people know about this statute and act accordingly, or do you often find, is it, you know, every other voter is wearing something? Or something in between? It is for the most part complied with, that Minnesotans understand that they're not allowed to wear political or campaign material. So let's continue on this, because I'm finding it useful. It sounded to me from your response, both to the Chief Justice and to me, that there are two people who make the decision as to whether it is or is not political. One is the election official, and the other is the person carrying the sign or wearing the T-shirt. Both make that decision, because if the second decides that the first is wrong, he simply goes in and continues to carry it. Then his name appears in a book. All right? If he does not want his name in a book, is there any action he could bring in order to remove his name from the book, on the ground that it wasn't political? There isn't any statute in Minnesota that allows somebody to change an official record of what happened, but that person could bring a lawsuit. They could bring a declaratory judgment action. They bring an APA action, or, you know, saying that this was unreasonable and improper listing. Certainly, Your Honor. So they could get a judge to do it, you think. Yes. But it's never happened, because there's never been a problem. Is that the answer? Yes, that's the answer. Okay. I mean, people go to vote after work, before work, in the middle of doing chores for the day, taking kids to school. So somebody goes to the polling place and is wearing a shirt, doesn't say anything about a candidate or a ballot issue, but a particular election judge, one of these people picked by one of the two parties, says, oh, that's political. So now this person has a choice. The person can wear a bathrobe or some kind of cover-up to go in and vote. You think that's not kind of humiliating? Or the person can be listed as a bad Minnesotan and at some point down the road potentially fined $300, found to have committed a petty offense. Your Honor. That's the situation, right? Your Honor, if the individual wore in a campaign shirt or a political shirt, they would be asked to cover it up, or if it was a button, to remove it. And there is no evidence in Minnesota, and certainly in the record, and no evidence at all that this has been a problem, that we've had people show up and say, I don't have any other way to move forward except to vote. Is there any evidence? Usually in First Amendment cases, we're concerned about overbreadth because of the chilling effect. It's often undocumented. And the burden is usually on the State to justify compelling interest, rather than the other way around. And so I guess my question for you is, it sounds like Minnesota's law is a bit of an outlier compared to most of the countries. There may be nine States or so with a statute that goes this far. Is there any documented need for a statute to go this far as opposed to what happens in most other States, which is limited to electioneering? Your Honor, I think the premise of your question is Minnesota's use of the word political. And there are 11 States that use the word political. Okay, 11. Whatever number it is, it's a minority number. And under your interpretation of political, it would forbid people from wearing certain portions of the Bill of Rights into a polling place, but not other portions of the Bill of Rights. And I guess I'm just wondering what compelling interest Minnesota has identified that requires a statute that goes so much further than the vast majority of States. Your Honor, the form analysis would indicate that the burden on the State is only to show reasonableness, and that our statute must... What evidence do we have? What record is there? What facts can you point to? Your Honor, it's the history of elections that was sufficient in Burson to show that wearing campaign material would have a detrimental effect on the polling place. Again, Burson was electioneering, a different statute. And you're asking us to go a step further than Burson, and I'm just wondering what do you have. And if the answer is nothing further than Burson, that's fine. That's an answer. Your Honor, the evidence that we have is the same as what was in Burson. And Burson is a case that did involve campaign speech. What was involved there was clearly understood to be, by this Court, to be campaign material related to buttons and T-shirts worn in the polling place and within 100 feet of the polling place. All that Minnesota's law does is expand the scope of what is prohibited from campaign speech to additional political speech. Political speech beyond solicitation for candidates or things on the ballot, right? Yes, beyond express advocacy. That is, that would be defined as campaign speech. And I think the First Amendment issue here, as my friend has described it, is whether or not there is any ability to ban what they call passive speech. The line that they've drawn here is not one about campaign speech or political speech or the way that this Court has described it, which is that there are instances where you can ban any type of speech, including on this Court's plaza, where any speech or any message on a banner, flag, or device is prohibited. Those are the types. It's clear that this Court has allowed the states to prohibit what they call passive speech. And instead of describing what the category is of speech, whether it's campaign, political, or all speech, their rule is if it's on a T-shirt, it doesn't matter what it says, that you can wear it in a polling place. And that was squarely rejected in Burson. And it was for the reasons that it impacts the integrity of the election by having political or campaign speech, and it impacts the decorum and solemnity of the polling  place. Kagan. Could you explain that for me a little bit more? Because, I mean, there are clearly some places where we think, you know, the courtroom is a good example, where we don't want anybody to be wearing buttons or wearing shirts of the kind that you're talking about. But why should a polling place be that sort of place? In other words, you talk about the decorum, the solemnity. It makes it sound a little bit church-like. Why is a polling place that? Why isn't it just the culmination of what is often a rowdy political process? So, for two reasons, Your Honor. I think the rowdy political process ends before you get into the polling place so that we can have an election that has integrity. That citizens, we have to, what we're doing is we're taking the citizens' decisions about who to vote for and turning it into electoral choices. And for that process to have integrity, the beginning of the process, the act of voting itself has to have integrity. And the integrity is not just actual integrity that somebody, that everybody who is entitled to vote was able to vote. It has to be perceived as having integrity. And one of the problems with allowing campaign or political material into the polling place is it creates a perception problem. The example is if you have two people, one wearing a Make America Great Again hat and one not wearing one. In Minnesota, we have challengers who can challenge the eligibility of someone to vote. If somebody challenges the Make America Great Again voter but not the other voter, the perception is, did they do that because of partisan reasons? How about the election judge who asks extra questions of the person wearing the Make America Great Again hat? Are they being singled out because of their political message? And ultimately, it impacts that voter, the voter next to them, and everybody in the polling place who now wonders. You exacerbate that problem by opening up the possibility of similarly partisan or seemingly partisan applications of your very broad statute. Your Honor, there is no evidence of any viewpoint discrimination in Minnesota in its hundred years. And as you had earlier asked, the way that this process works is that there are at least four poll workers in every single precinct in Minnesota. And when they're busy, there are more. And they are from different political parties. And so any viewpoint discrimination that could occur is likely to be self-corrected by others in the polling place. And ultimately, the decision about whether or not to move forward with any type of prosecution under the Office of Administrative Hearings is actually done either by the chief election judge or by the city clerk. All right. How is that going to happen? So let's say there's an election judge who's a Republican. And this Republican election judge thinks that a particular shirt has political connotations and says, nope, you can't go in. You've got to cover yourself up or go home and get changed. OK? And now that person thinks that's unfair. Then what happens? A Democratic judge intervenes. And then you have an argument between these two judges? Your Honor, what would happen in that instance is either the person would cover it up or there could be a discussion to say, this isn't political. And I want to talk to the head election judge. And then it would be resolved. And it would resolve. And who's the head election judge? The head election judge is a judge who is selected by the city clerk because they have more training. And usually, they've been an election judge for a long period of time so that they're familiar with all the processes. And I think one of the things that I think is important to understand is election judges have discretion to make a lot of different decisions in polling places. In Minnesota, we have same-day registration. They make decisions about whether or not somebody's qualified, has met their requirements to register. We also have challenge voters. When somebody is challenged because are they a felon or are they somehow not eligible to vote, the election judge puts them under oath and asks them questions and makes a determination about whether or not they're eligible to vote. So the idea that making a decision about whether or not something is political or not is well within the understanding of an election judge in Minnesota. And I think that the important issue here is the state's interest is the fundamental right to vote. This isn't just prohibiting speech at the DMV or at the post office. This is an election process that is incredibly important to democracy. It's incredibly important to the electoral branches of government to make sure that it has the integrity that's required so that when individuals are elected, that they have the legitimacy that's required to make sure that citizens believe that they are the rightful decision-makers. Alito Let me ask you about one of the interests that you assert in your brief. And this is on page 46 of your brief. A voter could well feel confused or intimidated if she walked into a polling place and discovered that every other voter held the opposite point of view on any number of controversial political issues related to electoral choices as evidenced by the political messages displayed on other voters' apparel. Do you think that's a compelling State interest? Do you think that's even a legitimate State interest? Yes, Your Honor. I think it's a legitimate State interest in a polling place to prohibit material that is going to make one voter feel singled out. That they could feel that they are not welcome in that polling place because they don't hold the same political views as everybody else. And ultimately, it could lead to the type of subtle intimidation that Burson found could be found just by wearing a vote for pick your candidate. The interest of making sure that the polling place doesn't have political material is the exact same interest that this Court found was sufficient to prohibit campaign material. And I think to go back to the question of line drawing, line drawing happens every single time when there's a content-based restriction. And the fact that there are hard calls at the edges of the line at the margin doesn't mean that the line that was drawn is unreasonable. All that it means is that there are hard cases, and there are always going to be hard cases. And ultimately, that's what as-applied challenges are for. And here, the material is... How would an as-applied challenge work on Election Day? You're not going to have an as-applied challenge when somebody goes to vote. Your Honor, the as-applied challenge could happen the way it happened in this case, where somebody brings a lawsuit. But in the case where somebody wears material, they either can continue to wear it, as the petitioners did here, and then go into an administrative process and say, it's not political. I have a right to wear this. So there's an easy way for somebody who believes that the material that they're wearing is not political to have an administrative review of that, if they believe that the election judges are acting inappropriately. And that suggests to me that your interest might not be terribly strong if someone's about to break the law, and you say, okay, go ahead, but, you know, we're going to write your name down, and, you know, you might... In other words, your interests... You've emphasized several times that the lack of, you know, nothing terribly bad happens to you when you do this. And that suggests to me that it's not that strong an interest. Your Honor... Aren't you worried, if you're not worried about intimidation, why do you let somebody go in with a button that violates your policy? Or why is the only thing you do is write his name down? Your Honor, the enforcement of this statute is done primarily by election judges telling people to cover up the material. And that has been sufficient in Minnesota to deal with the problem. We have 100 years of elections in Minnesota. Are those election officials inside the room? Yes, Your Honor. In other words, there's a voting booth and the table where you give your register. And so do other voters see this going on? They see the shirt and they hear the argument? Or is that in some different room? No, Your Honor, it happens right in the same room. Well, it seems to me that's more disruptive than wearing the shirt. Your Honor, Minnesota hasn't found it to be disruptive, that it's a quick conversation. Well, we're trying to understand how this thing works. Certainly, Your Honor. And we just said that you say a quick conversation, then the other judge comes over, then the intervening judge. That's got to take at least 10 minutes. And so I'm sitting there waiting in line for my vote and I hear all of this stuff? Your Honor, if there was such a discussion as that, what would happen is they would take it to a different area to talk about that. But I assume that the real work of this statute is being done by the fact that people know about it. And so people just don't wear these things for the most part. And you're always going to have cases where people don't know about it or maybe they want to challenge it. But those are going to be few and far between. And the real work is that people just approach the polling place in a different kind of way. That's correct, Your Honor. And in Minnesota, that is exactly what happens. And it makes it so that the voting process is one that Minnesotans can be proud of. We often lead the nation in electoral turnout. We have elections that have a high degree of integrity. We've had multiple statewide recounts that have not had any issues regarding whether or not political material was in the polling place. This statute has worked. It's worked well for more than 100 years. And the rule that is laid out makes it clear that it's only political material that is going to be something that is advocating for electoral choices. Suppose a group of people want to make a statement about a political issue. Not a political candidate, but a political issue. And they say we're going to do that by wearing all white on election day when we go to the polls. Would that be allowed? Under the statute, yes. It's not a political badge, button, or insignia. That doesn't express a view on a political issue? It might express a view on a political issue, but it's not a political badge, button, or insignia. An insignia is a distinguishing mark. It would have to have symbols or letters associated with it. So an article of clothing by itself, in general, is not going to be sufficient to be something that would be, under the statute, understood as a political badge, button, or insignia. So if a shirt has hashtag Me Too, that would be allowed or not allowed? Your Honor, that would be an insignia. And if that was an issue in elections in that polling place, that would be political. How do we determine if it's an issue? I'm sorry, Your Honor. How do we know if it's an issue? We know it from the campaigns that have occurred. That this is not done in a vacuum. This is done on election day by election judges who are in that community, who are aware of what the political issues are and what the political candidates are. This statute is limited in the same way that campaign speech is limited. It's limited by those individuals who are on the ballot and the issues that they've brought up. For example, the — So if a group said, well, okay, we're not going to be able to wear our Me Too shirt, but we're going to convey the same message by wearing all white, that would be okay? Your Honor, under our statute, I don't believe that would be a political insignia. Thank you, counsel. Maybe you can make it broader. May I, Your Honor? Your Honor, I think constitutionally we could. I think that that's exactly what the plaza rule for this Court is, is that you can make it broader. In a nonpublic forum, you can make it broader than the line that Minnesota's drawn. It's just the line that we have drawn. Thank you, counsel. Mr. Bremer, you have four minutes remaining. The statute does affect millions of people that go to the polls in Minnesota at polling places, absentee ballot locations throughout the state for 46 days prior to the election. And so what you just heard, I believe, is that there's going to be an effect of chilling all this legitimate speech, Me Too, Resist, Black Lives Matter, American Legion, Americans for Tax Reform, and the list goes on. But we were just told by a respondent that it has to be connected to an electoral choice in that election. Yes, Your Honor, and that's what they're saying now. But throughout this litigation, the lower courts view this as going towards all political views. Their position for seven years has been it covers all political views, and I believe they said that here as well. And the Election Day policy and both the statute are clear that it covers everything political. There's no qualification on the term political. As applied challenges to deal with this would result in an endless series of adjudications, either in the polling place itself or in courts later on. In the meantime, legitimate, protected speech and self-expression, like the Second Amendment on a shirt, would be chilled. And that's the purpose of the over-breath doctrine. Sotomayor, you have one person who says that this process delayed him five hours. Any process you institute, there's going to be an aberration. Your adversary says that most of the time, this goes by very quickly. Most of the time, the election judge or whomever tells the wearer, please cover up your So do we rule for the aberration or do we rule for the norm? I think you have to look at the evidence in the record, Your Honor. And this is the evidence we have on enforcement. We have two people that were told they either had to remove their clothing or have their name and address taken down for potential prosecution in order to vote. We also have a number of other people after the 2010 election that didn't even try to wear apparel because they were afraid of enforcement. That's at the joint appendix at page 117. I'm sorry. Let's not forget who these people were and what they were wearing. Please ID me, which for some people was a highly charged political message, which was found on remand, was intended to intimidate people to leave the polling booth, other people to leave the polling booth. So That's true. And there are concerns there. And it's not before the court. But it wasn't just the buttons. It wasn't just the buttons, Your Honor. How many incidences involving the examples that Justice Alito raised have been reported of people in Minnesota, of people wearing a button like an organizational chamber of commerce? We don't have record evidence of a button that would say that. But we do have record evidence of slogans like don't tread on me, liberty, that type of thing with the Tea Party. And we also have the election day policy, which the state says we are going to enforce. Right. Is that enough? I mean, read the whole First Amendment. You have freedom of thought, of expression, of communication, of petition. It's a process. And part of a process that allows ideas to flourish and get arguments back and forth, part of a process I think should be and the founders meant it to be some thought and reflection. And so here they've said the last moment in a world where we know how much argument there is in an election. It starts 19 years before and ends up in every conceivable place. We want to carve out 100 feet where this decision is going to be made and say to the person making it, think. It won't always work. Maybe it hardly ever works. But they're trying. And they're saying of course there will be some problems, though there have been none or virtually none in Minnesota for 100 years. You see my question? Yes, Your Honor. And there are legitimate interests in the polling place and in the right to vote. No one questions that. The problem here is this statute just goes too far. The appropriate result in this case is to invalidate the third sentence of the statute, give the Minnesota legislature another chance to draw up a more narrowly drawn statute if it wants to continue to have an apparel ban. Thank you, counsel. The case is submitted.